IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS D. GABARRETTE,            )<br>                                                      )<br>                   Petitioner,        )<br>                                                      )<br>         vs.                                         )<br>                                                      )<br>W. SULLIVAN, Warden,             )<br>                                                      )<br>                   Respondent.     )<br>_____ ) | No. C 04-5454 MJJ (PR)<br><br>**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS** |

Petitioner, a California prisoner, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254. The Court ordered respondent to show cause why the petition should not be granted. Respondent filed an answer accompanied by a memorandum and exhibits contending that the petition should be denied. Petitioner filed a traverse.

### BACKGROUND

In 1999, Petitioner was convicted of forcible sodomy (Cal. Pen. Code, § 286, subd. (c)),[1] forcible oral copulation (§ 288a, subd. (c)), assault with a firearm (§ 245, subd. (a)(2)), and false imprisonment (§ 236) in the Napa County Superior Court. He was sentenced to two consecutive terms of 15 years to life on the two sexual offenses, pursuant to section 667.61. He was further sentenced to a concurrent term of three years on the firearm assault,

---

[1] All statutory citations are to the California Penal Code unless otherwise indicated.

and a consecutive term of two years on the false imprisonment. He appealed his conviction and sentence to the California Court of Appeal.

The following facts are taken from an unpublished opinion of the California Court of Appeal, Ex. 3 at 1-6 (2002):

> The victim, Juanita C. testified that she was romantically involved with appellant[2] for several months. Appellant briefly lived with Juanita and her children in her mobile home. Because of the children's presence in the small mobile home, appellant and Juanita occasionally had sex in Juanita's car. Juanita testified her sexual relationship with appellant did not include anal intercourse.
>
> Juanita stated that in December of 1998, she ended the relationship and asked appellant to move out, which he did in January—after which he and Juanita no longer dated or engaged in sex. Appellant tried repeatedly to renew the relationship, and frequently called Juanita at home and at work. By September 1999, appellant was calling Juanita at work several times a day.
>
> On September 21, 1999, appellant came uninvited to Juanita's mobile home at approximately 9:30 p.m. Appellant told her his car was stuck in a ditch and asked Juanita to drive him to his car and help him pull it out. She agreed, and drove appellant to his car. Appellant attached a cable to both cars, and Juanita towed appellant's car out of the ditch. Appellant then asked Juanita to drive him to a gas station so he could call someone to pick him up. She agreed, but became suspicious when appellant directed her down a road leading away form the gas station. She pulled into a turnout and told appellant to get out of her car.
>
> Appellant refused and pulled out a small automatic pistol. Appellant pointed the pistol at Juanita, held it to her forehead, and told her he deliberately drove his car into the ditch to lure her there and kill her. He pointed the gun at her chest and stomach. Fearing for her life, Juanita tried to start her engine. Appellant struck her in the chest with his left hand, and hit her in the forehead with the gun, which he held in his right hand. Juanita's forehead began to bleed. She started crying, and appellant told her to stop or he would kill her "right away."
>
> Still holding the gun on Juanita, appellant forced her to move her seat back. He said he might "forgive" Juanita if she performed oral sex on him. Appellant forced Juanita to orally copulate him at gunpoint. As she orally copulated appellant for five minutes, the wound on her forehead bled when she moved.
>
> Appellant then forced Juanita over onto the passenger seat and demanded that she lie on her stomach. When she complied, appellant pulled down Juanita's pants and forcibly sodomized her. As he did so he continued to hold the gun in his right hand; indeed, Juanita testified appellant never put the gun down during either of the sex acts. Juanita, who was four feet eleven inches, did not try to fight appellant off because she was afraid he would kill her.
>
> At some point, possibly before but probably after the sex acts, appellant fired one shot from the pistol. He probably fired the shot while outside the car, or through an open window. Appellant gave Juanita a bullet—a live round, not

---

[2]Petitioner is referred to as "appellant" in the California Court of Appeal opinion.

a shell casing—and told her "that bullet was the one that was going to be for [her]." She dropped the bullet into the back seat.

After the sex acts Juanita returned to the driver's seat. Appellant became angry, "like turning crazy," and threatened to kill himself. He was still holding the gun. He told Juanita he had lured her to the scene of the sex acts because he had "promised himself" he was going to "have" Juanita "no matter what."

At appellant's request, Juanita began to drive around. Appellant kept saying he was going to kill himself. Appellant ordered Juanita to pull over and park on Mund Road. The two talked in the parked car for about an hour, with appellant pointing the gun at himself and threatening to take his own life.

Finally, Juanita said she would get back together with appellant if he promised not to commit suicide. She drove him back to his car and went home. She reported the incident to her sister and to a 911 operator, in neither case mentioning that she had been sexually assaulted. But she did tell the responding officer she had been "raped."

About 2:00 a.m. on September 22, 1999, a Napa County sheriff's deputy went to the home of Juanita's sister in response to a call that appellant was at that address. He found appellant sleeping under a car behind the garage, and told him he was wanted for hitting someone with a gun. Appellant denied having a gun, but a consent search of his car revealed an unloaded .25 automatic.

A search of Juanita's car revealed a live .25 bullet and an expended .25 cartridge. Ballistics tests showed the expended cartridge was fired from appellant's pistol. Forensic examination revealed sperm in the rear of Juanita's underwear, and smears of blood on the thigh area of appellant's trousers.

Appellant testified as follows:

He broke up with Juanita in January 1999 because he was seeing another woman and Juanita was tired of his drinking. After he moved out he and Juanita sometimes got along and sometimes didn't. When they were getting along, they engaged in sex—including oral copulation and anal intercourse. They would have sex in Juanita's car.

On the night of September 21, 1999, appellant's car got stuck and he walked to Juanita's house for help. She agreed to drive him to his car and help him extricate it. When this was accomplished, Juanita said she wanted to talk to appellant about problems with her children. Juanita drove the two to a spot, apparently on a rural road, where they had previously had sex.[3]

After a conversation appellant described as "friendly," appellant showed Juanita his pistol, which he had bought two or three days earlier. He did not point the gun at Juanita. The weapon was not loaded, but appellant had brought along bullets. Juanita asked him if the gun worked. To show that it did, he got out of the car, loaded the weapon, and fired one round into the ground. He gave the expended cartridge and a live round to Juanita.

Back in the car, appellant and Juanita began to hug and kiss and engaged in consensual oral copulation, vaginal intercourse, and anal intercourse. Juanita appeared to enjoy the sexual experience. Afterwards, appellant searched for a cigarette but came upon a photograph of another man inscribed "[Love] to Aracelia." Aracelia was Juanita's middle name. Appellant became angry and called Juanita a "fucking whore." She yelled back and grabbed his face; he responded by striking her with the pistol, which was held flat in his

---

[3] Juanita admitted on cross-examination that the area where the forcible sex acts occurred was the same area in which she and appellant once had consensual sex in her car.

>hand.  Appellant then became "remorseful"; Juanita agreed to drive him home. At this point the gun was on the floor of the car.
>
>Juanita stopped on Mund Road to talk to appellant about her children. She asked him to move back in with her, and he agreed.  She dropped him off at his car and asked him to come home with her.  Appellant told her to "go away" because he wanted to drink a beer he had in his car.  She called him a "fucking drunk" and a "piece of shit."[4]  Appellant riposted by again calling Juanita a "fucking whore."  Juanita angrily drove off, threatening to call the police.
>
>Appellant denied pointing the gun at Juanita or forcing her to engage in sexual acts.
>
>The people called three rebuttal witnesses, including Elmer Beck, Juanita's supervisor at St. Helena Hospital, where she worked as a cook.  Beck learned in late August 1999 that Juanita was getting an excessive number of telephone calls at work.  Beck mentioned this to Juanita.  He testified, over a defense hearsay objection, that Juanita told him she did not want to receive phone calls from the person who kept calling.
>
>For the next few days, in early September 1999, Beck took charge of the cordless phone and personally answered all incoming calls.  A man identifying himself as "Carlos"—appellant's first name—called three to five times a day. Beck testified, over a hearsay objection, that when Carlos called for Juanita he would ask "where she was."  Beck told Carlos that Juanita was not available to come to the phone.  Beck testified, again over a hearsay objection, that on hearing this, Carlos "became upset and asked me what type of organization I had, that I would not bring a person to the phone when they were wanted." Eventually, Carlos would call and identify himself, then recognize Beck's voice and hang up.

Ex. 3 at 1-6.  Petitioner's conviction was affirmed on appeal, but the case was remanded for resentencing.  *Id*. at 9.  The trial court resentenced Petitioner to a term of 15 years to life, plus a consecutive six-year term and two-year term.  On March 4, 2003, the California Court of Appeal affirmed the resentencing in an unpublished opinion.  The California Supreme Court denied certorari.  Petitioner also filed a habeas petition to the California Supreme Court; it was summarily denied.

In this petition, petitioner makes three claims: (1) statements he made to police were admitted at trial in violation of the Fifth Amendment; (2) his trial counsel provided ineffective assistance in failing to call three witnesses; (3) the admission of Elmer Beck's testimony violated due process.  Liberally construed, these are cognizable claims for federal habeas relief.

---

[4] On cross-examination, appellant admitted drinking 13 beers before going over to Juanita's house on September 21.

4

**DISCUSSION**

A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus submitted by an individual in custody pursuant to a state court judgment only if the custody violates the United States Constitution, laws or treaties.  28 U.S.C. § 2254(a) (2005); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001).  A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do.  *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).  When it is clear that a claim was not adjudicated on the merits in state court, the claim is subject to *de novo* review.  *See Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002); *see also Killian v. Poole*, 282 F.3d 1204, 1207-08 (9th Cir. 2002).

B.   Legal Claims

   1.   Admission of Petitioner's Statements to Police

Petitioner's first claim is that statements he made to City of Napa police officers after he was arrested were admitted into evidence against him in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  Petitioner claims he did not knowingly and intelligently waive his *Miranda* right to remain silent because the police only read the *Miranda* warnings to Petitioner in English, and Petitioner was not sufficiently fluent in English to understand those rights.  However, at trial, Petitioner's motion to suppress those statements was *granted*.  The trial court excluded Petitioner's statements to the police from the state's case in chief, and those statements were only admitted to impeach Petitioner after he testified.

Statements taken in violation of *Miranda* may be used to impeach a defendant's credibility even though they are inadmissible as evidence of guilt. *Harris v. New York*, 401 U.S. 222, 225 (1971). "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id*. at 226. After Petitioner testified, the state used his statements to the police to impeach his credibility. The state used those statements as a basis for questions during his cross-examination, and later presented testimony about the statements from one of the interrogating police officers, Sgt. Gallegos, on rebuttal.[5] Moreover, the trial court issued a limiting instruction to the jury. "[T]he out-of-court statements must be considered by you only for the purpose of testing the defendant's credibility as a witness. You must not consider the statement as evidence of guilt." (RT at 404.) Because Petitioner's statements were only used for impeachment, the admission of those statements did not violate the Fifth Amendment.

Petitioner does not directly claim that his statements were involuntary, but he does cite *Brown v. Mississippi*, 297 U.S. 278 (1936) (a conviction based on a coerced confession violates the constitutional right to due process), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973) (setting out the test for unconstitutional coercion). Petitioner also alleges that Sgt. Gallegos "did treaten [sic]" him, specifically "calling him piece of shit" and suggesting that he kill himself. Unconstitutionally coerced statements are not admissible for any purpose. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960).; *See Henry v. Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999). To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth*, 412 U.S. at 218, 226-27. "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."

---

[5]The essence of Sgt. Gallegos' testimony was that Petitioner lied while being questioned—abandoning certain assertions as they became less plausible. For example, Sgt. Gallegos testified that Petitioner initially denied having anal intercourse with the victim, only admitting it after he was told that she had been taken to the hospital for an exam.

7

*United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).  The facts alleged by Petitioner do not amount to unconstitutionally coercion.  Sgt. Gallegos' alleged insult of Petitioner, even combined with his suggesting suicide, were not so threatening or coercive as to reasonably be expected to overcome Petitioner's will.

Moreover, the erroneous admission of a coerced confession is subject to harmless error analysis.  *Fulminante v. Arizona*, 499 U.S. 279, 306-12 (1991).  Thus, even if Petitioner could provide evidence that his statements to the police were unconstitutionally coerced, he would also have to show that the admission of those statements had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir. 1995) (overruled on other grounds) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Here, the state's evidence against Petitioner was overwhelming.  The physical evidence included: the gun found in Petitioner's car, the matching shell casing and unused bullet of the same caliber found in the victim's car, the sperm in the rear of the victim's underwear, photographs of the injuries to the victim's forehead, and the blood on Petitioner's trousers.  The victim's testimony against Petitioner was detailed, compelling, and consistent with the physical evidence.  In addition, Petitioner admitted to the sex acts, firing the gun, drinking 13 beers that evening, and hitting the victim in the head with the gun.  Moreover, the damage from the Petitioner's custodial statements to Gallegos—in which Petitioner merely retreated from his initial story to that which resembled his testimony at trial—was relatively minor.  In sum, the state's physical evidence, eyewitness testimony, and Petitioner's own admissions were so persuasive that Petitioner cannot show that the admission of his custodial statements had any substantial effect on the jury's verdict.  Accordingly, habeas relief cannot be granted on this claim.

      2.      <u>Ineffective Assistance of Counsel</u>

The Sixth Amendment guarantees not only assistance, but effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Petitioner claims that his defense counsel was ineffective for failing to investigate and call three witnesses at trial.

8

Petitioner claims that he asked defense counsel to call two unnamed witnesses who allegedly would have testified that they had seen Petitioner and the victim together days before the incident. Petitioner claims that this testimony would have contradicted the victim's testimony "that she never went out with appellant." Petitioner also claims that he asked defense counsel to call a Mr. Hilberto Garcia—apparently the husband of the victim's sister—who would allegedly have contradicted the victim's testimony regarding her relationship with Petitioner. The witnesses did not testify.

The benchmark for judging a claim of ineffective assistance is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. In order to prevail, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id*. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A habeas petitioner has the burden of showing through evidentiary proof that counsel's performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir.), *cert. denied*, 498 U.S. 960 (1990). Here, beyond his own self-serving statements, Petitioner offers no evidence that the witnesses would have offered any testimony helpful to his defense. Specifically, Petitioner has not offered affidavits from any of the alleged witnesses. Therefore Petitioner has not satisfied the first *Strickland* prong.

Even assuming Petitioner could establish the alleged witnesses were available, credible, and would have testified as Petitioner suggests, Petitioner still does not establish a reasonable probability that the outcome of the trial would have changed. If the witnesses had contradicted the victim's characterization of her relationship with Petitioner, the greatest advantage Petitioner could have hoped for was some erosion of the her credibility. However, as discussed above, the physical evidence of the gun, the sperm, and the blood, as well as the

9

consistency of such evidence with the victim's testimony, was such that there is no "reasonable probability that the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As Petitioner's claim of ineffective assistance fails under *Strickland*, the California Supreme Court's courts denial of Petitioner's claim was neither contrary to, nor an unreasonable application of clear established Federal law. Accordingly, Petitioner can be granted no relief on this claim.

### 3. The Admission of Elmer Beck's Testimony

Petitioner claims that the admission of the hearsay testimony of Elmer Beck violated Petitioner's constitutional rights. Specifically, Petitioner objects to the admission of Beck's testimony that the victim stated to Beck that she did not want to receive phone calls from Petitioner. Petitioner also objects to Beck's testimony that, during the few days that Beck personally answered the phone, Beck heard Petitioner "ask where [the victim] was," question "what type of organization" Beck had when he refused to bring the victim to the phone, and that during subsequent call, when Petitioner recognized Beck's voice, Petitioner would identify himself and then hang up.

#### a. Due process

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).[6]

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v.*

---

[6] Petitioner brought this claim before the California Court of Appeal under the Due Process Clause, the Confrontation Clause and the California Evidence Code. In an unpublished opinion, the court upheld the admission of Beck's testimony under state law, but did not address the Due Process or Confrontation Clauses. Ex. 3 at 6-7.

*Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.  Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.  *See Jammal*, 926 F.2d at 920.

The jury could draw permissible inferences from Beck's testimony regarding Petitioner's statements to Beck over the phone.  Petitioner's identification of himself, inquiry into the whereabouts of the victim, and expression of frustration when told the victim was unavailable were probative of Petitioner's motive to commit the charged offenses—i.e., his desire to have contact with the victim regardless of her consent.  Moreover, the admission of a party's own out of court statements, so-called "party admissions," is an accepted practice that does not in and of itself render a trial fundamentally unfair.  *See* Fed. R. Evid. 801 advisory committee's note (citing Strahorn, *A Reconsideration of the Hearsay Rule and Admissions*, 85 U.Pa.L.Rev. 484, 564 (1937); Morgan, *Basic Problems of Evidence* 265 (1962); 4 Wigmore, Evidence § 1048) (Admissions by a party are not considered hearsay because their admissibility in evidence is the result of the adversarial system rather than satisfaction of the conditions of the hearsay rule, or considerations of trustworthiness.).  Thus, the admission of Petitioner's out of court statements did not violate his constitutional rights to due process.

The jury could also draw permissible inferences from Beck's testimony about the victim's prior consistent statements that she did not want to receive phone calls from Petitioner.  A "consistent statement, at a time prior to the existence of a fact said to indicate bias—will effectively explain away the force of the impeaching evidence." *Tome v. U.S.*, 513 U.S. 150, 156 (1995) (quoting 4 J. Wigmore, Evidence § 1128, p. 268; emphasis in original); *see also* Fed. R. Evid. 801 advisory committee's note ("If the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem.").  In other words, the admission of prior consistent statements is fundamentally fair because the declarant can be cross-examined about the statements, and the probative value of the statements is heightened where they are made prior to the occurrence of events which purportedly caused the witness's bias.  Here, Petitioner's defense was that the sex acts

11

were consensual and the victim was falsely accusing Petitioner, and that the victim was lying either because Petitioner had hit her with the gun or because Petitioner refused to go home with her after she dropped him off at his car. The victim's statement to Beck that she did not want to have contact with Petitioner was made days earlier, before the assault Petitioner contended caused her to be biased against him. The victim adopted the prior statements in her direct testimony and was cross-examined about them. Under such circumstances, the admission of Beck's testimony regarding the victim's prior consistent statement did not render Petitioner's trial fundamentally unfair.

Petitioner has argued that the victim's statement to Beck was not trustworthy because she was afraid that she would get into trouble at work unless she denied wanting to receive the calls. However, both the victim and Beck denied such a consequence. In any event, Petitioner was free to explore this issue on cross-examination of the victim, and to argue this improper motive to the jury. As Beck's testimony contained permissible inferences, its admission did not render Petitioner's trial fundamentally unfair.

Furthermore, in order to obtain habeas relief on the basis of an evidentiary error, a petitioner must show that the error was one of constitutional dimension and that it was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). He would have to show that the error had "'a substantial and injurious effect' on the verdict.'" *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623). As discussed above, the state's case against Petitioner was very strong, and there is no indication that Beck's testimony about these collateral incidents had any significant impact on the jury's verdict.

b. Confrontation Clause

Although Petitioner does not specifically state that the admission of Beck's testimony violated the Confrontation Clause, he does cite the Sixth Amendment in the "grounds for relief" section of his petition. The Confrontation Clause does not bar the admission of non-testimonial hearsay. *Davis v. Washington*, ___ U.S. ___, 126 S.Ct. 2266, 2273 (2006). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation

Clause." *Id*. However, even if the statements were testimonial, the Confrontation Clause does not bar the admission of testimonial hearsay when the declarant appears for cross-examination at trial. *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *California v. Green*, 399 U.S. 149, 162 (1970)). Here, both declarants—the victim and Petitioner—testified and were cross-examined. Thus, no relief can be granted on Petitioner's Confrontation Clause claims.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file and terminate all pending motions.

IT IS SO ORDERED.

DATED:   02/21/07

                                                             MARTIN J. JENKINS
                                                             United States District Judge